**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

ROBERT W. WILSON,                        )
                                         )
          **Plaintiff,**                )
                                         )
v.                                       )      **Case No. 07-CV-0520-CVE-FHM**
                                         )
FMS, Inc.,                               )
                                         )
          **Defendant.**               )

## OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 38). Plaintiff Robert W. Wilson filed a complaint on September 14, 2007 (Dkt. # 2) alleging that defendant interfered with his rights pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., and ultimately terminated his employment in retaliation for asserting those rights. Defendant now moves for summary judgment on the grounds that it did not interfere with plaintiff's right to take FMLA leave to care for a family member and that plaintiff's employment was terminated for reasons unrelated to his FMLA leave. For the reasons set forth below, the Court finds that defendant's motion should be **granted**.

## I.

The following facts are undisputed:[1] Defendant is a debt collection company that provides first and third party collection services, as well as recovery and receivables solutions to customers nationwide. Dkt. # 38, at 5. As part of its daily operations, defendant utilizes "state-of-the-art

---

[1]    Plaintiff has moved to strike portions of the summary judgment record as "irrelevant or immaterial." Dkt. # 52, at 8. However, pursuant to local rule, a party may not raise a motion or cross motion in a response to another party's motion. LCvR 7.2 (e). Further, the Court will make a determination of the materiality of disputed facts; it is unnecessary to rule on whether undisputed facts are material or immaterial, especially where the undisputed, arguably "immaterial" facts merely provide background information.

collection systems, dialer technologies, telecom systems and Interactive Voice Response solutions." Id.  Defendant operates two regional call centers, one of which is located in Tulsa, Oklahoma.  Id.

Defendant, as a debt collection service, is regulated by state and federal law, including the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq.  Id.  The FDCPA provides a cause of action for an individual who has a complaint against a debt collection agency, and allows the Federal Trade Commission ("FTC") to bring an administrative enforcement action against agencies that violate the FDCPA.  Id.  The FDCPA is a strict liability statute and penalties may include actual and statutory damages, court costs, and attorney's fees.  Id.  Defendant's employees are required to regularly attend training sessions on FDCPA and other state and federal laws.  Id.  Defendant's company policy requires employees to comply with the FDCPA and all other applicable state, federal, and local law. Dkt. # 38-2, at 2.  To ensure compliance with law and company policy, defendant randomly records telephone calls with debtors.  Dkt. # 38, at 5.

Debt collectors are grouped into teams, which may be reorganized depending on the requirements of a specific project.  Id. at 6.  Typically, teams are headed by a collection supervisor or collection manager and may have an assistant collection supervisor.  Id.  Collection supervisors typically report to Mike Wolfer (Vice President of Operations) and Wolfer reports to Steve Smith ("S. Smith") (Senior Vice President of Operations).  Id.

A.      Plaintiff's Employment at FMS

Plaintiff was hired on or about April 18, 2005 as a debt collector in the Tulsa call center.  Id. at 19.  On September 23, 2005, plaintiff was promoted to Assistant Manager, effective October 1, 2005, and his compensation changed from an hourly base rate plus commissions to a salary of $32,100 plus commissions.  Id.  At the time plaintiff was promoted, he had 7-8 years of experience

as a debt collector. Id. Plaintiff's responsibilities as Assistant Collection Manager included helping to supervise the team headed by Collection Supervisor Tonya Maupin, monitoring collector's calls to ensure compliance with company policies, coaching collectors on successful collection techniques, and assisting with training for collectors. Id. at 7. On February 23, 2006, plaintiff was promoted to Collection Supervisor, where he received a $38,400 base salary. Id. Plaintiff supervised between ten and eighteen collectors and his responsibilities remained the same. As a Collection Supervisor, plaintiff reported directly to Wolfer and S. Smith. Id. From April 2005 until August 2006, plaintiff had an "exemplary work record" and no disciplinary actions or violations of the FDCPA on his record. Dkt. # 52, at 19, 20. Plaintiff was well-regarded by upper management and other supervisors. Id. At the time of his discharge in May 2007, he was assigned as a collector to Collection Supervisor Allen Smith's ("A. Smith") team.[2] Dkt. # 38, at 16.

**B.      Training**

Defendant employed a director of Training and Quality Assurance, Michele Evangelista-Lehnus, who provided on-going training for all employees. Id. Defendant had monthly training sessions that employees were required to attend and employees were informed that failure to following company guidelines would have "repercussions." Id. at 8. Plaintiff attended the following monthly training sessions: "How to Collect an Out of Statute Account" (May 2005); "How to Handle a Mortgage or Re-Finance Loan" (June 2005); "FDCPA Overview" (July 2005); "TCPA: Telephone Consumer Protection Act" (August 2005); "Avoid Complaints - Be a Professional"(September 2005); "Daily Collector Requirements" (September 2005); "Procedure to

---

[2]      As discussed infra at 6, plaintiff was redesignated as a collector in October 2006 with no reduction in pay.

Cancel a Check or Debit Card Payment and EFT Process" (October 2005); "Wrong Phone Number Procedures" (November 2005); "Mini-Miranda, Monitor Disclosure, and Verification" (February 2006); "Third Party Disclosure" (May 2006); and "Importance of Complaint Prevention" (July 2006). Id. at 9. Plaintiff also received training on "FMS Talk-Off," "Rebuttals," "How to Pitch a Refinance Loan," and "Settlement Negotiations." Id. In addition, defendant sent plaintiff to Tulsa Community College to take classes to help him be an effective manager. Id.

Plaintiff received the "three or four" FDCPA compliance training sessions.[3] Id. at 16. Plaintiff was tested on FDCPA compliance on March 15, 2005 and March 14, 2007. Id. at 9. Plaintiff also received complaint prevention training, including training on how to verify payment arrangements between the debtor and defendant. Id.

**C.   Plaintiff's Attendance**

According to defendant's Employee Handbook (the "Handbook"), the attendance policy provides that "regular attendance and punctuality by all employees is essential" and "excessive absence and/or tardiness is unacceptable." Id. at 10. In addition, "repetitive excused absences and tardiness is just as serious as those that are unexcused, and either category can result in disciplinary action up to and including discharge." Id. Plaintiff admits to receiving and reading the Handbook when he was hired and trained. Id.

---

[3]   Plaintiff denies that the FDCPA training provided specific direction to employees with respect to how to handle a check that came back as on a "closed account." Dkt. # 38, at 9; Dkt. # 52, at 8. Plaintiff also disputes that it was "clearly indicated that it was not acceptable to try to process payment through a closed account." Id. However, at his deposition, plaintiff acknowledged that under "typical practices" it would not be appropriate to tell a debtor that FMS could use a closed account to hold the account open. Dkt. # 38-6, at 21.

From July through December 2005, plaintiff was absent for a total of approximately 60 hours.  Id. at 10.  In his December 16, 2005 evaluation, plaintiff's attendance was described as "adequate," but it was noted that he failed to provide doctor's notes for his absences as required by company policy.[4]  Id. at 11.  From January through August 2006, plaintiff took approximately 144 hours of non-FMLA leave.  Id. at 11.

From January through April 2007, plaintiff accumulated 39.75 hours of non-FMLA absence.  Id. at 14.  On February 19, 2007, plaintiff was given a "verbal warning" for absences on January 2, and February 12 and 14-16, 2007 and for tardiness on January 22 and February 8, 2007.  Dkt. # 52-5, at 68.  Plaintiff signed an Employee Warning Report, but failed to provide a written explanation of his conduct.  Id.  Plaintiff was given FMLA credit for February 14-16, 2007 because those absences were related to his 2007 FMLA leave, as discussed below.  Dkt. # 52-5, at 75.

**D.     Plaintiff's FMLA Leave**

On August 29, 2006, plaintiff had back surgery.  Dkt. # 52, at 20.  Plaintiff spoke with Don Padden, Human Resources Manager, who informed him that his back injury could potentially qualify him for FMLA leave.  Dkt. # 38, at 12.  Defendant's FMLA policy, which is included in the Handbook, provides for "up to twelve weeks of leave in any twelve month period."  Id. at 10.  Since October 1, 2005, defendant has had seventeen employees, including plaintiff, take FMLA leave.  Id. at 18.  Plaintiff provided defendant with medical certification indicating that he would require continuing treatment of steroid injections.  Id. at 12.  Plaintiff started his FMLA intermittent leave on September 7, 2006.  Dkt. # 52, at 20.  Defendant recorded plaintiff's FMLA leave on a tracking

---

[4]     Plaintiff disputes defendant's contention that his attendance was a "problem" from the outset of his employment.  Dkt. # 38, at 10; Dkt. # 52, at 10.  Plaintiff also disputes defendant's statement that plaintiff's "absence issues continued into 2006."  Dkt. # 52, at 10.

sheet, which reflected a total of 301.75 hours of FMLA leave from September through December 2006.  Dkt. # 38, at 12.

In a letter dated October 6, 2006, plaintiff was informed that "[He] will be a collector until [he is] able to perform all the duties of a collection supervisor. [He] will be paid [his] same rate of pay and will clock-in to record [his] hours for FMLA purposes."  Dkt. # 52-5, at  76.  Plaintiff believed that he was treated unfairly by management and that he was being isolated from other employees, on orders from management, because he was on FMLA leave.  Dkt. # 52, at 21.  Plaintiff alleges that he attended a meeting with John Smith ("J. Smith") (President of FMS), Forrest Towry (Operations Manager), and Wolfer regarding his concerns.  Id.  Plaintiff alleges that J. Smith now denies that the meeting took place.  Id.  However, defendant disputes that characterization because at J. Smith's deposition he stated that he could not recall whether such a meeting took place.  Dkt. # 58, at 13-14; Dkt. # 52-5, at 20.

In February 2007, plaintiff's wife, who had been suffering from mental health issues, attempted suicide.  Dkt. # 52, at 21.  Plaintiff informed defendant that he would need intermittent leave to care for her.[5]  Dkt. # 38, at 13.  Plaintiff testified that Padden told him that FMLA leave might be available to help him protect his salary and position.  Id.  On a separate tracking sheet, defendant recorded approximately 275.5 hours of FMLA leave in order for plaintiff to care for his wife.[6]  Id.  This tracking sheet reflects absences between February and May 2007.  Id. at 13-14.  In

---

[5]     Defendant argues that plaintiff failed to provide detailed information regarding his wife's mental health records; plaintiff disputes that contention.  Dkt. # 38, at 13, n. 12; Dkt. #  52, at 10.

[6]     Plaintiff disputes the method used to calculate the FMLA leave period.  Dkt. # 52, at 11.

the twelve month period between May 10, 2006 and May 10, 2007, plaintiff took a total of 577.25 hours of FMLA leave.  Id. at 14; Dkt. # 52, at 11.

**E.     Plaintiff's Discharge**

At the beginning of May 2007, Robin Vann, a collector, had several large checks returned as "Non-Sufficient Funds" or "Account Closed."  Dkt. # 39, at 15.  This was unusual and raised red flags at the company.  Id.  Vann's supervisor, A. Smith, who was also plaintiff's supervisor, began an investigation that revealed that Vann had received a phone call from a debtor, Michael Ramirez, on March 26, 2007 (the "Call").  Dkt. # 38, at 15.  Ramirez called in connection with a debt totaling $2,381.43 owed on Wal-Mart account number 10678115.  Id.  During the Call, Vann and Ramirez agreed to set up a post-dated electronic funds transaction ("EFT") for payment of the balance in full. Id.  Plaintiff then spoke with Ramirez to verify this transaction, as required by company policy.[7] Id.  During the verification process, Ramirez told plaintiff that the account they had agreed to use was a closed account.  Dkt. # 40.  Plaintiff then asked Ramirez if "we are just doing this to hold payment" and Ramirez replied that they were.  Id.  Plaintiff then said, "Gotcha, we'll get it set up then, thank you very much, sir."  Id.  According to defendant, Vann and plaintiff's representations

---

[7]     Plaintiff disputes that he "verified" the transaction that Vann set up, and claims that he told Vann not to complete the transaction and asked him to correct the account notes.  Dkt. # 52, at 11.

to Ramirez violated the FDCPA and company policy.[8]  Dkt. # 52-5, at 73.  The account notes made by plaintiff state "VER PDC BIF ALL ACCTS 2381.43."[9]  Dkt. # 38-3, at 3.

The Ramirez account notes show that on May 5, 2007, Vann had a second contact with Ramirez and set up another EFT to run on May 31, 2007,  using the same checking account that had been returned as "account closed."  Id. at 16.  A. Smith noticed that Vann set up this second EFT and asked Vann, "Why [would you set up] an[o]th[e]r EFT on an acc[oun]t th[a]t was r[e]t[u]rn[e]d to us acc[oun]t is cl[o]s[e]d?? Acc[oun]t # did not ch[a]ng[e]."  Id.

The Call was recorded and later retrieved by the IT Department after an investigation revealed the potential misconduct.  Id.  The recording of the Call was brought to J. Smith so he could listen to it.  Dkt. # 52-5, at 15.  J. Smith did not know the identities of the employees before he listened to the recording.[10]   Id.  The conduct recorded on the Call violated the FDCPA and potentially subjected defendant to civil litigation and/or administrative fines.[11]  Dkt. # 38, at 17.  J. Smith, in consultation with Padden, Wolfer, and Kathryn Martin (corporate counsel), decided to

---

[8]     Section 807 prohibits the use of use of "any false representation or deceptive means to collect or attempt to collect any debt."  15 U.S.C. § 1692e. It is a violation of section 808 if, inter alia, a debt collector accepts "a check or other payment instrument postdated by more than five days unless such person is notified in writing of the debt collector's intent to deposit such check or instrument not more than ten nor less than three business days prior to such deposit."  15 U.S.C. § 1692f.  Here, the post-dated EFT was on a closed account.

[9]     The notation in the account notes means that plaintiff verified a post-dated check for the balance in full for all accounts in the amount of $2381.43.  Plaintiff claims that the Ramirez account notes are misleading because they do not contain information reflecting whether charges were ultimately made against Ramirez's bank account.  Dkt. # 52, at 22.

[10]    Plaintiff disputes the fact that J. Smith did not know plaintiff's identity when he heard the recording.  Dkt. # 52, at 18.

[11]    Plaintiff disputes that his statements on the Call and the accompanying notes are sufficient to show that a violation of the FDCPA occurred.  Dkt. # 52, at 23.

terminate both employees.  <u>Id.</u>  However, when J. Smith learned that plaintiff was one of the employees, he sought advice from Martin because he was aware that plaintiff was on FMLA intermittent leave and had concerns about the legal ramifications of firing an employee on leave. Dkt. # 52-5, at 20.  J. Smith testified that he did not know any specific details of plaintiff's FMLA leave.  <u>Id.</u>

On May 9, 2007, A. Smith, plaintiff's supervisor, called plaintiff and asked him to come to the office the next day for a meeting with Human Resources.  <u>Id.</u>  At that meeting, A. Smith, Towry, and Padden informed plaintiff that his employment was being terminated for violating the FDCPA and company policy.  <u>Id.</u>  Plaintiff knew which account and transaction this alleged violation related to before he was told.  Dkt. # 38, at 17.  Plaintiff was discharged on May 10, 2007.  Dkt. # 38, at 15. Vann, who was not on FMLA leave, was discharged on May 9, 2007 in connection with the Ramirez account.  Dkt. # 38-50.  Of the seventeen employees on FMLA leave from October 2005 through April 2008, three, including plaintiff, were involuntarily discharged from their employment.  Dkt. # 38-51.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); <u>Kendall v. Watkins</u>, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 317.

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

The FMLA guarantees the right of an eligible employee of a covered employer to receive up to twelve weeks of unpaid leave for serious health conditions or to care for a family member. Metzler v. Federal Home Loan Bank of Topeka, 464 F. 3d 1164, 1180 (10th Cir. 2006).  At the end of the leave, the employee must be reinstated to his position or to a position equivalent in pay, benefits, and other terms and conditions of employment. See 29 U.S.C. § 2614(a)(1).  The Tenth Circuit has recognized two distinct theories of relief pursuant to the FMLA: interference with the employee's FMLA leave under § 2615(a)(1), and retaliation under § 2615(a)(2). Metzler, 464 F.

3d at 1170. Plaintiff alleges violations of his rights under the FMLA arising from his 2007 FMLA leave[12] under both theories, and each will be addressed in turn.

## A.    Interference Claim

Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. § 2615(a)(1). To establish an interference claim, a plaintiff must show "(1) that he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." Jones v. Denver Pub. Sch., 427 F. 3d 1315, 1319 (10th Cir. 2005). Under an interference theory, an employer's intent in denying or interfering with an employee's FMLA rights is not relevant. See Bones v. Honeywell Int'l, Inc.,

---

[12]    Plaintiff, in his response to defendant's motion for summary judgment and after close of the discovery period, tries to bootstrap claims for interference and retaliation arising from his 2006 FMLA leave in an effort to create a genuine issue of material fact. However, plaintiff as "master of the complaint" bears the responsibility of setting forth the claims that he wishes to raise. See Chicago v. Int'l College of Surgeons, 522 U.S. 156, 163 (1997). While claims not contained in the complaint but raised in response to a motion for summary judgment may be treated as a request to amend the complaint, a district court may refuse to address such a claim, especially if the defendant will be substantially prejudiced by allowing the claim to come in at this late stage of the litigation. See Orr v. City of Albuquerque, 417 F. 3d 1144, 1153 (10th Cir. 2005); Evans v. McDonald's Corp., 936 F. 2d 1087, 1091 (10th Cir. 1991) (citing Fisher v. Metropolitan Life Ins. Co., 895 F. 2d 1073, 1078 (5th Cir. 1990) (claims raised in a response to a motion for summary judgment are not properly before the Court and need not be addressed)). Plaintiff does not state a claim for relief based on alleged FMLA violations pertaining to his 2006 FMLA leave, nor does the complaint allege any facts to put defendant on notice that the 2006 FMLA leave is at issue. Dkt. # 2. Further, in the joint status report, plaintiff states that he engaged in a protected activity by taking FMLA leave "for the care of a qualified family member." Dkt. # 15, at 1. This clearly indicates an intent to raise a claim based on the 2007 FMLA to care for his wife, not the 2006 FMLA leave for his back injury. Because the complaint does not assert any claims based on the 2006 FMLA leave, those claims are not properly raised and will not be considered. Nor will leave to amend (which has not been requested) be permitted at this late stage of the litigation.

366 F.3d 869, 877 (10th Cir. 2004).  Nonetheless, the FMLA is not a strict liability statute and nothing in the FMLA entitles an employee to greater protection from termination not related to his FMLA leave.  Metzler, 464 F. 3d at 1180 (citations omitted).

For the purposes of this motion for summary judgment only, defendant does not contest plaintiff's entitlement to take FMLA leave to care for his wife. Dkt. # 38, at 20.  Accordingly, the Court finds that the first element of the interference claim is satisfied.  Next, plaintiff must raise a genuine issue of material fact as to whether he was prevented from taking the full twelve weeks of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave.  Campbell v. Gambro Healthcare, Inc., 478 F. 3d 1282, 1287 (10th Cir. 2007).  It is undisputed that plaintiff received 577.25 hours of FMLA leave in the twelve months prior to his discharge in May 2007. Dkt. # 58, at 19.  However, plaintiff now argues that he was fired while he had FMLA leave remaining, effectively denying his right to use his remaining FMLA leave.  If plaintiff exhausted his FMLA leave prior to termination, however, defendant could not have interfered with plaintiff's exercise of FMLA rights by firing him.  On the other hand, if plaintiff had leave remaining, then firing him could be construed as an act of interference.[13]

Whether plaintiff had leave remaining at the time of his termination depends on how the twelve month period is calculated.  The amount of leave to which an employee is entitled is governed by 29 C.F.R. § 825.200.  An employer is permitted to select one of the following four

---

[13]   This is not to say that an employee may not be dismissed during an FMLA leave period; employment may be terminated if it is unrelated to the FMLA leave.  Smith v. Diffee Ford-Lincoln-Mercury, 298 F. 3d 955, 961 (10th Cir. 2002); see also Gunnell v. Utah Valley State College, 152 F. 3d 1253, 1262 (10th Cir. 1998) ("[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting the request.").

methods for calculating an employee's leave: (1) the calendar year; (2) any fixed twelve-month "leave-year;" (3) the twelve-month period measured forward from the date of the employee's first FMLA leave; or (4) a "rolling" twelve-month period measured backward from the date an employee first uses any FMLA leave.  29 C.F.R. § 825.200(b).  Employers are required to apply the selected method "uniformly to all employees" and must give sixty days' notice to all employees before changing calculation methods.  29 C.F.R. § 825.200(d)(1).  If an employer fails to designate a method of calculation, the option that is "most beneficial to the employee will be used."  29 C.F.R. § 825.200(e).

Plaintiff argues that defendant failed to select a calculation method, and as such either the calendar year method or the "fixed year" method should be applied.  In response defendant asserts that it selected the "rolling method," as explained in the Handbook.  Dkt. # 58-2.  Plaintiff disputes defendant's contention that the Handbook identifies a calculation method.[14]   Defendant counters that, even if the Handbook does not identify the method selected, an employer is not required to provide written notice to employees of the calculation method.  Plaintiff, relying on the Ninth Circuit's decision in Bachelder v. America West Airlines, 259 F. 3d 1112 (9th Cir. 2001), contends that where an employer fails to adequately notify employees of the calculation method selected, the method most beneficial to the employee should be used.  However, the Tenth Circuit has not directly ruled on the result of an employer's failure to notify employees of the calculation method, and other courts have varied in their response to Bachelder.  See, e.g., Thom v. American Standard, Inc., 562

---

[14]     The Handbook contains a section, Family and Medical Leave, which explains the company's policies with respect to the FMLA.  Dkt. # 38-32, at 50.  While the name of the calculation method selected is not explicitly stated, it is clear from a careful reading of the section that defendant did not select the calendar year or fixed year method and instead employed either the third or fourth method.

F. Supp. 2d 949, 953 (N.D. Ohio 2008); Austin v. Fuel Systems, LLC, 379 F. Supp. 2d 884, 896 (W.D. Mich. 2004) ("[E]mployers are required to notify employees of the method of FMLA leave calculation, and that when employers fail to do so, leave is to be calculated in the manner most beneficial to the employee."); but see Phillips v. Leroy-Somer North America, No. 01-1046-T, 2003 WL 1790941 (W.D. Tenn. Mar. 28, 2003); Kelso v. Corning Cable Sys. Int'l Corp., 224 F.Supp. 2d 1052 (W.D.N.C. 2002) ("The only regulation that addresses that issue is part 825.200(d)(1), which provides notice be given if the employer changes calculation periods."). Nonetheless, the Court need not decide whether the Tenth Circuit would agree with the holding in Bachelder because, even if plaintiff had leave remaining at the time his employment was terminated, he must raise a genuine issue of material fact as to whether the adverse employment action was related to plaintiff's exercise of his FMLA rights.

The critical inquiry here is whether plaintiff's termination was related to the exercise or attempted exercise of his FMLA rights. To prevail on the third prong of an interference claim, a plaintiff must allege and present evidence indicating that there is a causal connection between an adverse employment action and the exercise or attempted exercise of plaintiff's FMLA rights. Metzler, 464 F. 3d at 1180-81. A reason for termination that is "insufficiently related to FMLA leave will not support recovery under an interference theory." Smith, 298 F. 3d at 961; McBride v. CITGO Petroleum Corp., 281 F. 3d 1099, 1108 (10th Cir. 2002) (FMLA does not protect employees from dismissal based on reasons unrelated to the FMLA). In contrast to a retaliation claim, the burden of proof in an interference claim does not shift to the defendant. Metzler, 464 F. 3d at 1180. However, if plaintiff can show that his termination was related to his FMLA leave, the employer

must be able to prove that the dismissal would have occurred regardless of the FMLA leave.  Id. (citing Smith, 298 F. 3d at 963).

Plaintiff's arguments notwithstanding, plaintiff has the ultimate burden to prove a relationship between the adverse employment action and the exercise of plaintiff's FMLA rights. Metzler, 464 F. 3d at 1180-81.  Accordingly, to survive summary judgment, plaintiff must set forth facts suggesting that he was fired because of his FMLA leave to raise a genuine issue of material fact.  Plaintiff did not argue temporal proximity between commencement of his 2007 FMLA leave and his termination.  Here, plaintiff began his leave in February 2007 and was fired in May 2007. In fact, the timing of events is actually a better indication that plaintiff's termination was related to the FDCPA violation; plaintiff was fired in the days immediately following the discovery of the violation.  Even if plaintiff had made a temporal proximity argument, the Tenth Circuit has held that the employee must "present evidence of temporal proximity plus circumstantial evidence of retaliatory motive."  See Campbell, 478 F. 3d at 1290.  Plaintiff does not raise a genuine issue of material fact with respect to either.

Plaintiff suggests that given his history of absences and given that this was his second FMLA leave, defendant was looking for an excuse to fire him.  In fact, it was defendant that suggested plaintiff take FMLA leave to care for his wife to best protect his position.  Dkt. # 38-6, at 23.  Also, the record reflects that there are other FMS employees on FMLA leave who were not involuntarily terminated.  See Dkt. # 38-51, at 2-3.  Plaintiff does not present any evidence that a relationship existed between his absences and his termination.  Accordingly, plaintiff has not raised a genuine issue of material fact as to the third element of an interference claim.

Nonetheless, the Court considers plaintiff's contention that there is a genuine issue of material fact as to whether plaintiff would have been fired regardless of his FMLA leave. Plaintiff argues that his conduct did not violate the FDCPA and defendant knew that it did not, making the alleged violation nothing more than an excuse to fire plaintiff. In support of his argument, plaintiff presents the following evidence: (1) following the call with Ramirez, plaintiff told Vann that he could not run the check on a closed account (Dkt. # 52-4, at 1); (2) plaintiff did not "intentionally enter" the verification notes in the debtor's account (id. at 2); (3) plaintiff informed Vann's supervisor, A. Smith, that Vann's accounts should be reviewed[15]  (Dkt. # 52-3, at 44); and (4) plaintiff did not have a duty to follow up and was not involved in running the EFT on the closed account (Dkt. # 52-2, at 42; Dkt. # 52-4, at 2). In response, defendant argues that none of the issues plaintiff raises is a genuine issue of material fact. Instead, very simply, plaintiff was fired for violating the FDCPA when he verified an EFT on an account he knew was closed. Dkt. # 38-41; Dkt. # 52-5, at 73. In his deposition, plaintiff stated that under "typical practices" it would not be appropriate to tell a debtor that the company could use a closed account to keep the account open. Dkt. # 38-6, at 21. Nonetheless, plaintiff is heard on the recording of the Call telling Ramirez that he would  "set up" an EFT on a closed bank account. Dkt. # 40. The account notes reflect plaintiff's discussion with the debtor and state that plaintiff verified a post-dated check for the balance in full for all accounts. Dkt. # 38-3, at 3. Plaintiff devotes much space in his response to a discussion of how the account notes system works, whether a notation must be affirmatively entered, how "hot keys" work, whether he told Vann to stop the EFT, and whether he or A. Smith had the duty to follow up to make sure the EFT did not go through. However, the Court finds that

---

[15]        A. Smith denies that plaintiff reported Vann's conduct to him. Dkt. # 58-4, at 3.

these issues are not material.  Regardless of whether plaintiff took action to stop the EFT from being processed, defendant relied on the recording and the account notes to make the decision to terminate plaintiff's employment.

Plaintiff further argues that there is a genuine issue of material fact as to whether defendant suggests that plaintiff was responsible for the second contact with Ramirez that resulted in the EFT being processed.  It is immaterial that plaintiff was not involved in the May 2007 EFT; plaintiff's comments on the Call in March provided sufficient grounds for termination regardless of whether plaintiff was involved in further interactions with the debtor.

The Court, after drawing all reasonable inferences in plaintiff's favor, finds that plaintiff has failed to raise a genuine issue of material fact as to whether there is a relationship between plaintiff's termination and his exercise of his FMLA rights.  Accordingly, defendant is entitled to summary judgment on plaintiff's interference claim.

**B.      Retaliation Claim**

It is a violation of the FMLA to terminate an employee because he chose to exercise his FMLA rights.  See 29 U.S.C. § 2615(a)(2).  To establish a prima facie case of retaliation under the FMLA, a plaintiff must show that (1) he engaged in a protected activity; (2) his employer took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action.  Metzler, 464 F. 3d at 1171.  "A causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Garrett v. Hewlett-Packard Co., 305 F. 3d 1210, 1221 (10th Cir. 2002) (citations omitted).  If an employee can establish a prima facie case of retaliation, the burden shifts to the employer to

articulate a legitimate, non-retaliatory reason for plaintiff's termination.  See Campbell, 478 F. 3d

at 1287 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)).  Then, to defeat

summary judgment, plaintiff must show that there is a genuine issue of material fact as to whether

defendant's proffered reasons for termination are pretextual.  Metzler, 464 F. 3d at 1172.

        Here, plaintiff fails to address his prima facie case for retaliation, and instead immediately

addresses whether defendant's explanation for terminating his employment is pretextual.  Although

plaintiff failed to meet his burden on his prima facie case, the first two elements of the prima facie

case for retaliation are easily satisfied; plaintiff engaged in a protected activity by taking FMLA leave

and defendant's decision to fire him was clearly an action that a reasonable employee would have

found to be materially adverse.  However, the third prong of the prima facie case for retaliation

presents the same problem as the third prong of the  interference claim – plaintiff does not raise a

genuine issue of material fact as to a causal connection between the FMLA leave and the termination

of plaintiff's employment.  Nonetheless, defendant has articulated a legitimate, non-retaliatory reason

for plaintiff's termination (violation of the FDCPA) and the Court will examine whether there is a

genuine issue of material fact with respect to pretext.

         To show pretext a plaintiff needs to demonstrate either that the employer was more likely

motivated by a discriminatory reason than by the stated reason or that the employer's proffered

explanation is not credible.  Rea v. Martin Marietta Corp., 29 F. 3d 1450, 1455 (10th Cir. 1994)

(citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)).  "[M]ere conjecture

that [an] employer's explanation is a pretext for intentional discrimination is an insufficient basis for

a denial of summary judgment."  Branson v. Price River Coal Co., 853 F. 2d 768, 772 (10th Cir.

1988) (summary judgment affirmed where plaintiff presented no evidence indicating that she was

fired based on age discrimination).  Further, courts are not permitted to second-guess an employer's business judgment and it is the perception of the employer at the time which is relevant.  Id. (citations omitted).  See also Watts v. Norman, 270 F. 3d 1288, 1295 (10th Cir. 2001) ("In determining whether the proffered reason for a decision was pretextual, [courts] examine the facts as they appear to the person making the decision.").  The business reason for termination is not converted into pretext merely because it turns out that the business judgment was incorrect.  McKnight v. Kimberly Clark Corp., 149 F. 3d 1125, 1149 (10th Cir. 1998).  A good faith belief, after investigation, that employment should be terminated is sufficient to survive summary judgment.  Id.

To establish a genuine issue of material fact with respect to pretext, plaintiff claims that: (1) he was written up for an absence due to FMLA leave, demonstrating that defendant has an anti-FMLA bias; (2) J. Smith knew that it was plaintiff's voice on the recording and knew that plaintiff was on FMLA leave when he made the decision to fire him;[16] (3) plaintiff did not violate the FDCPA, defendant must have known that, and as such defendant's explanation for plaintiff's firing must be pretextual; and (4) even if plaintiff did violate the FDCPA and company policy, the fact that he was not offered re-training demonstrates that the stated reason was pretext.  None of these claims, even if true, raises a genuine issue of material fact with respect to pretext.

First, plaintiff argues that being reprimanded for his absence on days when he was on FMLA leave shows that defendant had an anti-FMLA motive.  In fact, plaintiff was reprimanded for several unexcused absences and declined to identify the reason for absence on the Employee Warning

---

[16]     Plaintiff also claims, with respect to his 2006 FMLA leave, that J. Smith denied having met with plaintiff to discuss plaintiff's concerns, thus casting doubt on J. Smith's credibility. Although plaintiff did not state claims based on his 2006 FMLA leave (see note 12, supra), it is worth noting that J. Smith did not deny having met with plaintiff, but rather stated that he did not recall such a meeting.  Dkt. # 52-5, at 20.

Report, which he signed.  Dkt. # 52-5, at 68.  Plaintiff eventually received FMLA credit anyway. Dkt. # 52-5, at 75.  There is no genuine issue of material fact raised with respect to these absences which would indicate that defendant's explanation is pretextual.

Second, plaintiff argues that dishonesty about a material fact may be considered "affirmative evidence of guilt."  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) (citations omitted).  However, plaintiff's assertion that J. Smith lied about recognizing plaintiff's voice, and thus was dishonest about a material fact, is incorrect.  While there is evidence in the record that plaintiff reported daily to S. Smith and was supervised by A. Smith, plaintiff argues that he had daily contact with J. Smith and for that reason J. Smith must have recognized his voice on the recording.  Dkt. # 38, at 7; Dkt. # 52, at 18.  Even if J. Smith knew he was listening to plaintiff's voice on the recording, that still does not raise a genuine issue of <u>material</u> fact as to whether plaintiff's firing was pretextual.  J. Smith has consistently stated that he made the decision to fire plaintiff because of what he heard on the recording and saw in the account notes.  Dkt. # 38-42, at 2.  Whether or not J. Smith knew prior to listening to the recording that plaintiff was one of the employees involved with the interaction is not material.

Similarly, plaintiff argues that there is a genuine issue of material fact with respect to whether it is credible that J. Smith did not know which employee he was firing.  Plaintiff seemingly disregards J. Smith's testimony where he states that he knew, after listening to the recording, that he had decided to fire plaintiff, an employee on FMLA leave.  Dkt. # 52-5, at 20.  J. Smith then asked for advice from corporate counsel to make sure the termination was handled correctly.  Dkt. # 38, at 17.  Thus, there is no dispute as to whether J. Smith knew whom he was firing.

Third, there is nothing in the record to indicate that defendant believed that plaintiff did not violate the FDCPA.  Defendant concluded that plaintiff's statements constituted either "false, deceptive, or misleading representation[s]" to a debtor "in connection with the collection of any debt,"  15 U.S.C. § 1692e, or "unfair or unconscionable means [of] collect[ing] or attempt[ing] to collect a debt.  15 U.S.C. § 1692f.  Even if defendant was mistaken and plaintiff's conduct was not sufficient to violate the FDCPA, J. Smith exercised his business judgment in firing both employees involved with the incident, including Vann who was not on FMLA leave.  In any event, the Court will not, through the benefit of hindsight, second-guess J. Smith's decision to terminate the employment of two employees who violated the law and company policy.  See McKnight, 149 F. 3d at 1129.

Finally, the Handbook clearly states that "FMS reserves the right to administer any step of discipline it deems appropriate" (Dkt. # 38-32, at 26) and plaintiff admits in his deposition testimony that there would be "repercussions" for a violation of the FDCPA.  Dkt. # 52-2, at 28.  There is no indication in the Handbook or anywhere else in the record that employees who violate the FDCPA are entitled to re-training, even if some employees have previously received re-training instead of termination.  In addition, Vann, who was not on FMLA leave, was also discharged without re-training.

Plaintiff fails to raise a genuine issue of material fact that an anti-FMLA animus was more likely the real motivation behind plaintiff's termination; defendant was neither resistant to nor unsupportive of plaintiff's FMLA leave.  In fact, plaintiff admits that Human Resources Manager Padden suggested that plaintiff consider FMLA leave instead of taking time off without it.  Dkt. # 52-3, at 28.  Moreover, plaintiff has not demonstrated that defendant's explanation is "not worthy of

21

credence." <u>Rea</u>, 29 F. 3d at 1455. Plaintiff's statements on the Call provided sufficient grounds for dismissal. The undisputed facts, especially the recording of the Call, demonstrate that the ground upon which defendant professes to have terminated plaintiff is not pretextual.

Because plaintiff has not demonstrated that there is a genuine issue of material fact with respect to the existence of a causal connection between his firing and the FMLA or whether the explanation for plaintiff's firing was pretextual, plaintiff cannot survive summary judgment. Any factual disputes between the parties relate to immaterial matters and do not preclude summary judgment.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Brief in Support (Dkt. # 38) is **granted**. A separate judgment is entered herewith.

**DATED** this 27th day of October, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

22